**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

IN RE: Lumber Liquidators Chinese-Manufactured Laminate Flooring Durability Marketing and Sales Practices Litigation

MDL No. 1:16-md-2743 (AJT/TRJ)

**REPRESENTATIVE CLASS ACTION COMPLAINT**

Lead Plaintiffs ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon the investigation conducted by and through their attorneys, which include, among other things, review and analysis of Lumber Liquidators Holdings, Inc.'s public documents, Securities and Exchange Commission ("SEC") filings, web sites, announcements, analysts' reports and investigative journalist reports.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

**INTRODUCTION**

1.      This is a breach of warranty, fraudulent omission/concealment, and federal and state statutory class action on behalf of a class consisting of all persons who purchased from Lumber Liquidators, Inc. ("Lumber Liquidators" or "the Company") laminate flooring products manufactured in China under the private-label "Dream Home" brand (the "Laminates"), seeking to recover damages caused by the Company's failure to deliver durable flooring for general household use and that complied with the specified industry standard contained in the product

description. These products are not durable as represented and are not merchantable for general household use. Lumber Liquidators' failure to disclose that the Laminates were substandard and defective caused Plaintiffs and the proposed class to overpay for the subject flooring.

2.      Lumber Liquidators is one of the largest specialty retailers of hardwood flooring and laminates in the United States.  The Company sells directly to homeowners and to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states, including Alabama, California, Nevada, New York and Virginia.

## GENERALIZED FACTUAL ALLEGATIONS

3.      Prior to Plaintiffs' purchases, Lumber Liquidators extensively advertised and marketed the Laminates as durable and compliant with an established European abrasion criteria[1] or class, "AC3," which is the primary industry standard for durability of laminate flooring. However, the Laminates are not durable or AC3-compliant.

4.      An AC3-rated laminate is considered in the industry as suitable for general household use, including high traffic areas such as hallways and kitchens.

5.      Lumber Liquidators, on its website, describes the suitability of AC3-rated laminates as "Residential, Heavy Traffic: Suitable for all areas."

6.      In the United States, laminate flooring with less than an AC3 rating are not considered suitable for general household use.

7.      Each of the Plaintiffs sought, intended, was informed and led to believe that he or she was buying, and intended to buy, laminate flooring suitable for general household use.

---

[1] On its webpage, "What's an AC Rating", Lumber Liquidators refers to the European Producers of Laminate Flooring (EPLF) Abrasion Rating System "to give us a way of determining durability and recommended usage level of different laminate floors.  The common term used to denote the durability level of laminate flooring is the Abrasion Criteria or 'AC' rating."

8.      The "Dream Home" brand is a private-label brand owned, marketed, and sold exclusively by Lumber Liquidators.  The Dream Home brand includes the St. James, Ispiri, Kensington Manor, and Nirvana flooring lines.

9.      From time to time, Lumber Liquidators sourced laminate flooring under the "Dream Home" brand from plants located in different countries, including the United States. The Laminates that are the subject to this action are limited to Lumber Liquidators' Chinese-manufactured laminate flooring.

10.     Plaintiffs purchased the Laminates through Lumber Liquidators' company-owned retail outlets, based upon express representations of the Laminates' durability and AC3 rating, made not only by Lumber Liquidators on its website product pages for each of the Laminates, but also based upon express oral representations by Lumber Liquidators' store managers and sales staff that the Laminates were "very durable," "extremely durable," "scratch resistant," and "harder than hardwood."

11.     Many Plaintiffs had, before purchase of the Laminates, specific concerns regarding the susceptibility of laminate flooring to scratching from the claws of their pets. Lumber Liquidators told them that they had nothing to worry about: the Laminates would stand up to pets, as attested to in video posted on its website focused on this very concern.

12.     Lumber Liquidators has promoted the Laminates through its in-store management and sales staff, who are trained based upon—and are encourage to consult and repeat—the product specifications, features, and supposed "advantages" described on product pages for each of the Laminates on the Lumber Liquidators web site.  Each of the individual Laminates' product pages describe the Laminate as meeting the industry AC3 standard.

/ / /

13.     The AC3 standard to which Lumber Liquidators claims that its Laminates adhere is the primary basis upon which:

    a.  Its in-store sales staff represents that the Laminates are "durable," "very durable," "extremely durable," "scratch resistant," and "harder than hardwood";

    b.  Its Laminates "landing page" on its website (from which the consumer can select model-specific web pages containing  detailed descriptions of each model) have represented that the Laminates are each "very durable" and "very scratch resistant"; and

    c.  Lumber Liquidators claims, in its Limited Warranties, that the Laminates each meet the "industry's highest standards."

14.     Despite Defendant's pervasive representations, the Laminates are not AC3 compliant and not durable, as revealed by extensive, recent product testing as part of the investigation leading to this action.

15.     The failure of the Laminates to meet the industry AC3 standard as claimed leads to a host of problems for consumers and Plaintiffs as set forth below, including but not limited to:

    a.  Visible and unsightly scratching in normal everyday use, including but not limited to pet traffic;

    b.  Wear patterns that expose and deteriorate the photographic paper layer of the laminate that is supposed to be protected by the wear layer for twenty five to thirty years;

    c.  Chipping;

    d.  Fading;

e.   Bubbling;

f.   Warping/curling; and

g.   Staining.

**The Laminates Are Substantially Similar Products**

16.     Laminate flooring is considered in the industry as a commodity product, in the sense that its construction is relatively uniform across brands and models, with each seller competing largely on the basis of price.

17.     As set forth in greater detail below, the Laminates comprise a single product, which are substantial similar in every way material to the claims presented herein.  The differences among each model of the Laminates are primarily cosmetic—designed to meet varying interior decoration preferences of consumers (including color, style of wood grain image, board width, etc.).

18.     Typically, laminate flooring sold at retail for residential use is constructed using four basic layers:

a.   The bottom backing layer (balancing layer) to create a stable and level support for the rest of the plank;

b.   On top of the backing layer is a medium density or high density fiberboard core, which are frequently referred to in the industry interchangeably as MDF or HDF cores;

c.   On top of the core is an decorative layer (photograph paper) of wood grain or other pattern; and

d.   The transparent top layer of a melamine resin, the wear layer, provides protection against wear, scratching, staining, and fading.

19.    The laminate floor is created when the 4 layers are pressed together under pressure and heat.  The sheets are then cut into individual planks and frequently have tongue and groove edges cut into them.[2]

20.    An image on Lumber Liquidators' website confirms that the Laminates are substantially similar:



This image was created by Lumber Liquidators to advance its position that its Chinese-manufactured laminates (the same products as the Laminates) do not violate California Air Resources Board regulations for formaldehyde.  The fact that the Company is able to describe the construction and manufacturing process for each of the Laminates in a single image

---

[2] Laminate flooring is frequently installed on underlayment material to improve sound or moisture performance, and occasionally such underlayment is pre-glued to the backing layer for convenience.

demonstrates that the Laminates are substantially similar products

21.     The Laminates are distinguished primarily based upon aesthetic considerations having to do with the color and wood grain depiction of the decorative layer, the gloss, the width of the boards, and other variables (including thickness) which do not materially affect the durability of the various Laminates.

**"Durability"  And Similar Descriptions Are Based On The AC3 Rating**

22.     Whether or not a laminate meets the AC3 standard is dependent upon the thickness, uniformity, and composition of the top wear layer.

23.     In the residential laminate flooring industry, AC rating is closely associated with "durability."

24.     An example is Pergo.  Pergo is the most prominent brand of laminate flooring sold in the United States.  On its website, www.pergo.com, under the tab "Information & Help" and the pick list "FAQs" for the question "How is Pergo laminate flooring constructed?" is explained:

> The first component is our patented ScratchGuard Advanced surface protection, which is comprised of a melamine resin enriched with aluminum oxide particles for enhanced scratch and scuff protection. In our most premium performance floors, ScratchGuard Advanced is combined with our innovative PermaMax™ wear layer to create a highly durable and wear-resistant surface that provides twice the wear and twice the durability* versus ordinary laminates.

> The asterisk next to "durability" in the above quote references the following note:

>  *Wear Claim compared to standard AC-3 laminate flooring and measured in accordance with NALFA/ANSI LF-01 2011 and/or EN 13329:2009-01.[3]

25.     The term "durable" when used in the retail residential laminate flooring industry is a reference to—and evaluated by—the relative AC rating of the laminate flooring product.

_____

[3] https://na.pergo.com/Care_Maintenance/faq (last visited Feb. 27, 2017).

26.     "Durable," when used in the retail residential wood laminate flooring industry, means an AC rating of at least AC3.

27.     The term "premium" in the retail residential laminate flooring industry is a reference to—and evaluated by—the relative AC rating of the laminate flooring product.

28.     "Premium" as used in this industry means an AC rating of at least AC3.

29.     Lumber Liquidators itself equates its laminates' AC rating with their durability. On a webpage published by Lumber Liquidators on its website no later than May 7, 2013, at http://www.lumberliquidators.com/blog/whats-an-ac-rating, Lumber Liquidator states (emphases added):

> Considering some new laminate thanks to your coupon? You may think the thicker the laminate the better, and the longer the warranty the longer it will last! That isn't always the case, though.  **So how do you know which laminate will last in your home** (or commercial space)?  Luckily, **the European Producers of Laminate Flooring (EPLF) developed the Abrasion Rating System to give us a way of determining durability** and recommended usage level of different laminate floors.  **The common term used to denote the durability of laminate flooring is the Abrasion Criteria or "AC" rating.**
>
> **So, what exactly do AC ratings tell us?  They represent a laminate's resistance to abrasion, impact, stains and cigarette burns. AC ratings also indicate that the product has been tested for the effects of furniture legs, castors, and swelling along its edges.**  When a laminate flooring product has a rating, then it has passed all of the test criteria. Failing just one test will disqualify a product.
>
> The AC rating levels are designated AC1 through AC5, **each reflecting the product's application and durability.**
>
> • • •
>
> **An AC3 for residential use is perfectly adequate. Typically the higher the laminate flooring rating, the higher the price may be.**

30.     Accordingly, when sellers of residential laminate flooring in the United States refer to a laminate product as "durable," "very durable," "scratch resistant," "harder than

hardwood," such representations constitutes a representation that the subject laminate meets at least the AC3 durability standard.

31.     Additionally, when Lumber Liquidators made express representations regarding the durability and scratch resistance and premium quality of the Laminates on its website, and when it trained it retail store managers and sales staff to describe the Laminates to shoppers as "durable," "very durable," "scratch resistant," "would not scratch," "would not scratch from pet nails," "harder than hardwood," "just as durable as hardwood," and similar representations, it did so based upon its claim that the product met the AC3 industry standard for durability, including wear resistance.

**General Residential Laminate Flooring Must Be AC3 Or Better to Be Merchantable**

32.     Lumber Liquidators' primary competition in the residential flooring market, and in particular the market for laminate flooring, have for many years been the "big box" stores Lowe's and Home Depot.

33.     Lowe's and Home Depot, as well as smaller independent flooring retailers, sell non-private-label laminate flooring in addition to any private-label laminate that they sell.  The following branded laminate flooring manufacturers each specify a minimum rating of AC3 for the U.S. market: Pergo, Bruce Laminate, Armstrong Laminate, QuickStep Laminate, and Alloc Laminate.

34.     Major retail sellers of residential laminate flooring in the United States—including Lumber Liquidators, Lowe's, and Home Depot—have settled on AC3 as the suitable minimum product standard in terms of durability for general use residential flooring.

35.     Lowe's does not offer any laminate flooring with a durability rating less than AC3 on its website or in its stores.

36.     Home Depot's website offers some 393 laminate flooring models in its "residential" or "commercial-residential" lines, all of which have a rating of AC3 or higher. Home Depot's website offers no laminate flooring with a durability rating under AC3.[4]

37.     In the market for laminate flooring in the United States, in order for laminate residential flooring to pass without objection in the trade for general residential use (including hallways and kitchens), a laminate must meet at least the AC3 durability standard.

**Lumber Liquidators' Responsibility for Marketing Defective Laminates**

38.     In January 2011, Lumber Liquidators, whose stock is publically traded, under the direction of founder and Thomas D. Sullivan, hired Robert M. Lynch as President and Chief Executive Officer.  Lynch brought with him to Lumber Liquidators William K. Schlegel as the new Chief Merchandising Officer for the Company.

39.     Between February 22, 2012, and February 27, 2015, these officers and Chief Financial Officer Daniel Terrell reported record gross margins which were significantly higher than its major competitors (Home Depot and Lowe's).  Through these officers, Lumber Liquidators misrepresented that the major driver of its high margins were legitimate "sourcing initiatives" implemented by the company in China designed to reduce the cost of goods, cut out middlemen, increase control by the company, and strengthen relationships with its suppliers.

40.     Sullivan, Lynch, Schlegel, and Terrell were individual defendants in a nationwide class action alleging that each of them and the company committed securities fraud in violation,

---

[4] http://www.homedepot.com/b/Flooring-Laminate-Flooring-Laminate-Wood-Flooring/N-5yc1vZbejk (visited March 1, 2016).  In addition to these 291 laminates, Home Depot's website lists three Shaw products that are shown as having an AC2 rating.  However none of these models is actually available for purchase online or in any identifiable store, and Home Depot's customer care department confirms that they are no longer available and have been discontinued.

*inter alia,* of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S. Code § 78j, and SEC Rule 10b-5 promulgated thereunder.  *See In re Lumber Liquidators Holdings, Inc. Securities Litigation*, Case No. 4:13-cv-00157-(E.D. Va.).  An element of a Section 10(b) securities fraud action is "scienter," defined as having either an intent to deceive or having been reckless in the making of false or misleading representations, or with respect to an omission of material fact. On November 17, 2016, the Honorable Arenda L. Wright Allen approved the settlement between the plaintiffs and Lumber Liquidators in the securities litigation.

41.     Lynch and Schlegel had extensive prior experience in sourcing products from Chinese manufacturing plants prior to joining Lumber Liquidators.

42.     Among flooring retailers, laminates fill a product niche as a relatively inexpensive alternative to real (natural) solid wood flooring, generally offering the look of wood at a lower price point.  This is was the niche that Lumber Liquidators' Dream Home private-label brand of laminates filled.

43.     For many years, laminates and solid wood flooring have constituted the most significant product ranges for Lumber Liquidators in terms of sales.

44.     Soon after they joined Lumber Liquidators, Lynch and Schlegel engaged in a so-called "sourcing initiative" regarding the Laminates.  As part of this initiative, they travelled to China and conduct "line reviews," consisting of requiring competing Chinese laminates mills to re-bid for Lumber Liquidators' laminate business.

45.     Lumber Liquidators obtained steep discounts from the Chinese mills that manufactured the Laminates.  After receiving these discounts, Lumber Liquidators continued to represent to its customers that the Laminates complied with all regulatory and applicable industry standards, including notably the standards for formaldehyde emissions established by

the California Air Resources Board ("CARB 2") and the European AC3 durability standard.

Lumber Liquidators was selling substandard laminates as premium products, thereby inflating its

margins.

46.     Based on Lynch's and Schlegel's prior experience in sourcing products from

China and on widespread industry knowledge by American companies sourcing products there,

Lumber Liquidators knew, or recklessly disregarded, that negotiating steep price discounts with

Chinese manufactures ran a high risk of such manufacturers cutting corners to reduce

manufacturing costs in order to maintain margin or profits, regardless of the technical

requirements of Lumber Liquidators' supply contracts and product specifications.

47.     In March 2015, the CBS News program "60 Minutes" broadcast the findings of its

extensive investigation, which included hidden on camera interviews several plant managers at

Lumber Liquidators' Chinese suppliers, revealing that 30 out of the 31 boxes of Laminates

purchased in the United States by CBS did not comply with the CARB 2 standard as represented

on Lumber Liquidators' website and on its Dream Home product labels.

48.     In an on-camera interview broadcast by 60 Minutes, a plant manager of one of

Lumber Liquidators Laminates suppliers, referring to a package of Lumber Liquidators' Dream

Home laminate flooring on the plant floor, admitted that the product was not CARB 2 compliant.

He further stated that the plant was capable of manufacturing CARB 2 laminate, but that it would

be more expensive to do so.

49.     On May 7, 2015, Lumber Liquidators discontinued all sales of Chinese-sourced

laminates, when it had approximately $20 million inventory of this product on hand.

50.     On December 21, 2015, the Honorable Arenda L. Wright Allen of the United

States District Court for the Eastern District of Virginia entered a ruling denying Lumber

Liquidators', Sullivan's, Lynch's, and Schlegel's motions to dismiss the security fraud claims, finding that the allegations met the heightened pleading standards for scienter set forth in the Private Securities Litigation Reform Act of 1995.  She did so in part based upon the allegations in the Consolidated Amended Compliant for violation of the Federal Securities Laws in the above-reference case, summarized above, concerning Lumber Liquidators' "sourcing initiatives" and "line reviews" by Lynch and Schlegel, and the Company's allegedly false explanations of the nature of its elevated margins for the Laminates, based upon the sale of cheaper, non-CARB 2 compliant Laminates.

51.     Similar to the formaldehyde non-compliance of the Laminates (which is not the basis of any claims made in this action), Lumber Liquidators' Chinese suppliers have the capacity to manufacture AC3 laminate flooring, but it is more expensive to do so (versus manufacturing AC2, AC1, or laminates that fail even the AC1 standard, such as the Laminates). This is because the incorporation of more resilient wear layers is more expensive.

52.     Similar to the formaldehyde non-compliance of the Laminates (which is not the basis for any claims made in this action), Lumber Liquidators knew that its Laminates did not comply with AC3, or was reckless in continuing to represent AC3 compliance without independently verifying same, after negotiating discounts with its Laminates suppliers.

53.     In a "limited warranty" that Lumber Liquidators contends it extended to Plaintiffs and all putative class members in conjunction with their purchases of the St. James, Ispiri, Kensington Manor, and Nirvana lines of Dream Home brand Laminates, Lumber Liquidators states:

> Each board is meticulously inspected throughout the manufacturing process to make sure it complies with [St James's] unwavering standards

If these statements are true, then Lumber Liquidators must have known that the Laminates were not AC3 compliant, as extensive testing by Plaintiffs has now revealed.

54.     In its warranties for the Laminates, Lumber Liquidators states that the Laminates are "free of defects."

55.     Lumber Liquidators knew that its Laminates did not comply with AC3, or was reckless in continuing to represent AC3 compliance without independently verifying after negotiating discounts with its Laminates suppliers.

**Lumber Liquidator's Website and Other Misrepresentations And Omissions**

56.     For each of the Plaintiffs in this complaint, *infra*, to have researched their Laminate purchase on the Lumber Liquidators' website, he or she visited, at a minimum, two pages shortly before purchasing these products:

a.      a laminates "landing page" ("Laminates Landing Page") describing the Company's wood laminate flooring, including the Laminates, and containing specific representations; and

b.      a product-specific page, accessed by clicking on an image or name shown on the Laminates Landing Page, that provided more particular specification for each Laminate product purchased by Plaintiffs.

57.     As alleged more particularly below, the Plaintiffs who researched their Laminate purchases on Defendants' website saw the following representations by Lumber Liquidators on the Laminates Landing Page shorty before purchasing their respective Laminates:

a.      "Very durable and scratch-resistant;" or

b.      "very scratch-resistant."

58.     Each Laminate product-specific webpage expressly described the Laminate as having an AC rating of "AC3."

59.     Each Plaintiff who researched their Laminate on Defendant's website saw the Laminate Landing Page representations corresponding to the time of their purchase, and also saw the AC3 rating on the product-specific web page, and relied upon these representations in purchasing their respective Laminates, as more particularly alleged below.

60.     Defendant's website advertised that the Laminates, including the "St. James Collection," the "Kensington Manor Collection," and the "Ispiri Collection" all have an AC rating of "AC3."

61.     Defendant also represents on its website that the St. James Collection is "very durable" and comes with a "30 year warranty."

62.     Defendant also represents on its website that "Kensington Manor is a premium 12mm laminate" and lists the "Kensington Manor Flooring Advantages," which include an AC Rating of AC3 and a 30-year warranty.

63.     Defendant also represents on its website that its Ispiri Collection has certain superior qualities and ingredients: "With its new laminate manufacturing process called Liquid Oxide High Definition technology the Ispiri Collection has raised the bar on . . . durability."

64.     Further, Defendant's website represents the "Ispiri Collection's Advantages" include an AC rating of AC3 and a 30 year warranty.

65.     Lumber Liquidators' store managers and staff, who are employees of Defendant, are trained by Lumber Liquidators to answer customer questions and to market the Laminates.

66.     These employees are encouraged and trained to use Lumber Liquidators product descriptions contained on Defendants' website, including the Laminate Landing Page and product-specific pages for the Laminates, to describe the Laminates' characteristics and qualities.

/ / /

67.     As set forth more particularly below, these employees systematically told Plaintiffs and other customers that  the Laminates were "very durable," "just as durable as U.S.-made laminates," "would not scratch," "scratch-resistant," "more durable than hardwood," "harder than hardwood," "wood not scratch from  pet nails," and would "hold up" to pets.  These representations were made to Plaintiffs and to putative class members based upon the Laminates' claimed AC3 compliance.

68.     Defendant, and its employees, failed to disclose to each Plaintiff that the Laminates were not AC3 compliant, were not durable, were not scratch-resistant, and would not resist fading, staining, and the other problems alleged herein relating to the defect.

69.     On page one of its invoices provided to Plaintiffs at the time of sale, Lumber Liquidators states that each Laminate comes with a "[30-]year warranty." There is no reference on page one of the invoice to a "limited warranty," and no indication of any limitation to the warranty on this page.

70.     The Disclaimers on page two of the invoices are not conspicuous, are vague and in most cases do not mention the word "merchantability" as required under the Uniform Commercial Code in effect in 49 states as a requirement to disclaim the implied warranty of merchantability.

71.     Lumber Liquidators' "limited warranties" for the Laminates were not presented to or shown to the Plaintiffs at the time of the sale.

72.     Any limitations in the limited warranties fail of their essential purpose, or are otherwise both procedurally and substantively unconscionable, and therefore ineffective.

**<u>Why Lumber Liquidator's Representations Are False</u>**

73.     Lumber Liquidators' representations that the Laminates meet the industry AC3 standard are false because the Laminates to not meet this standard.

74.     Lumber Liquidators' representations that the Laminates are "durable," very durable," "very scratch-resistant," "scratch-resistant," and "harder than hardwood" and the oral representations listed above and more particularly below are false because the Laminates do not have these qualities, on account of the defect alleged herein.

**Plaintiffs' Discovery of the Durability Defect**

75.     Over the 22 months, samples of the Laminates were tested by a certified and accredited laboratory. The testing method used by the lab is the same standardized test method used worldwide throughout the flooring industry to determine the AC rating of laminate flooring products. The Laminates failed to meet the AC3 standard.

76.     Whether a product complies with the AC3 industry standard is not knowledge that would be apparent to consumers. AC3 testing is expensive and requires special expertise and equipment not readily available or accessible to a consumer.

77.     When Lumber Liquidators, through its customer service department or through store sales personnel, are approached with durability issues such as scratching and the other manifestations of the defect alleged herein, it engages in a pattern and practice of delay and obfuscation.

78.     Lumber Liquidators personnel did not inform any Plaintiff that his or her durability problems, as set forth below, resulted from the failure of the Laminate to meet the claimed AC3 industry standard.

79.     A common practice at Lumber Liquidators—both as to Plaintiffs and to putative class members—has been to blame durability problems and defects on:

a.     Installers or installation problems;

b.     Moisture problems;

c.     Normal product variability; and

d.      Product abuse.

80.     Lumber Liquidators' lawyers recently attributed the detailed product defect

manifestations listed in a prior proceeding to installation failures, further continuing the pattern

of denial by Lumber Liquidators and confirming their client's previous pattern.

81.     By engaging in a pattern and practice of deflecting durability problems

attributable to the defect alleged herein—failure to meet the claimed industry AC3 standard—or

by attributing durability problems to causes other than the defect (*e.g.*, installation), Lumber

Liquidator fraudulently concealed the defect from Plaintiffs and putative class members.

82.     Plaintiffs and putative class members cannot reasonably be charged with notice of

the defect prior to the discovery of widespread supplier problems relating to Lumber

Liquidators' Chinese-sourced Laminates as a result of the formaldehyde controversy in March

2015.

83.     Defendant sells the Dream Home line of laminate flooring products, and others, at

Lumber Liquidators' 5 stores in Alabama, 37 retail stores in California, 3 stores in Nevada, 19

stores in New York, and 12 stores in Virginia.  Lumber Liquidators also sells these laminate

floor products to consumers through the internet at www.lumberliquidators.com and through

telephone sales at 1-800-HARDWOOD.

84.     Plaintiffs seek to represent themselves and all similarly-situated persons in

Alabama, California, Nevada, New York and Virginia who have purchased the Laminates from

Defendant at any time from the date the Laminates were first placed into the marketplace

through the date of judgment herein (the "Class").  Plaintiffs seek damages and equitable relief

on behalf of the Class, which relief includes but is not limited to restitution to the Plaintiffs and

Class Members of the full amount of the purchase price and out-of-pocket expense paid to install

their laminate flooring, the cost or replacing the defective flooring, injunctive relief and declaratory relief, and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the Class.

## PARTIES

85.     Plaintiff Erin Florez resides in Alabaster, Alabama.

86.     Plaintiff Jim Moylen resides in Elk Grove, California.

87.     Plaintiff Kelly Ryan resides in Henderson, Nevada.

88.     Plaintiff Karen Hotaling resides in Phoenix, New York.

89.     Plaintiff Logan Perel resides in Alexandria, Virginia.

90.     Defendant Lumber Liquidators, Inc. is a Delaware corporation with its headquarters and principal place of business at 3000 John Deere Road, Toano, Virginia.  Lumber Liquidators, Inc. distributes, markets, and/or sells the laminate flooring at issue and actively conducts business in Alabama, California, Nevada, New York and Virginia.

## JURISDICTION AND VENUE

91.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in each of the proposed classes and at least one member of the class of Plaintiffs is a citizen of a state different from the Defendant.

92.     This Court has personal jurisdiction over the parties in this action by the fact that Defendant is a Virginia corporation that is authorized to conduct business in Virginia and it has intentionally availed itself of the laws and markets of Virginia through the promotion, marketing, distribution and sale of its laminate wood flooring products.

93.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a), because Defendant transacts a substantial amount of its business in this District.  Venue is also based on the transfer order of the Judicial Panel on Multidistrict Litigation.

## PARTICULARIZED FACTUAL ALLEGATIONS

94.     In or about February 15, 2014, Plaintiff Erin Florez purchased Kensington Manor Warm Springs Chestnut 12mm laminate flooring from Lumber Liquidators' store # 1206 located in Birmingham, Alabama. Defendant's webpage for Kensington Manor Warm Springs Chestnut represents that "Kensington Manor is a premium ... product line" that has a "moisture resistant board." The landing page immediately before the page for the Kensington Manor Warm Springs Chestnut laminate product stated that Lumber Liquidators' laminate flooring is "very durable and scratch resistant." Defendant's webpage also advertises that this product has an AC rating of AC3 and a 30 year warranty. On the day of her purchase, Plaintiff told the Lumber Liquidators' salesman she was concerned about durability and specifically about the floor's ability to withstand scratches from her pet's claws. In response, Plaintiff was shown a chart, which was placed prominently in front of each piece of laminate for sale, displaying that each laminate, including the Kensington Manor Warm Springs Chestnut, had an AC rating of AC3, was scratch resistant and was durable. Plaintiff relied upon the above-referenced representations in making her decision to purchase this product from Defendant. However, soon after installation, Plaintiff noticed buckling and peeling of the surface of the flooring. Ms. Florez has used Defendant's product as it was intended to be used for normal residential traffic, but the flooring does not withstand normal wear and tear during normal use and has failed and deteriorated long before its advertised useful life. Ms. Florez would not have purchased the Kensington Manor Warm

Springs Chestnut laminate product had she known that it was defective, not durable, and had an inferior ability to withstand abrasion, scratches, stains and edge curling.

95.     At the time she purchased her flooring Ms. Florez received a two-page invoice. The first page of the invoice mentioned a "30 year warranty." The second page of the invoice recited a disclaimer of all other implied and express warranties, but did not mention the warranty of merchantability. The second page of the invoice included a signature line but it was left blank.

96.     On or about July 12, 2014 and August 8, 2014, Plaintiff Jim Moylen purchased Kensington Manor Warm Springs Chestnut 12mm laminate flooring from Lumber Liquidators' store #1034 located in Rancho Cordova, California.  Plaintiff Jim Moylen researched Defendant's Laminates on Defendant's website prior to his purchase of his laminate flooring. Defendant's webpage for Kensington Manor Warm Springs Chestnut 12mm laminate represents that "Kensington Manor is a premium 12mm laminate" with a "30-Year Warranty."  The landing page immediately before the page for the Kensington Manor Warm Springs Chestnut 12mm laminate stated that Lumber Liquidators' laminate flooring is "very durable and scratch resistant."  Defendant's webpage also advertises that this product has an AC rating of "AC3" and a 30-year warranty.  In addition, on the day of his purchase, Mr. Moylen told the Lumber Liquidators' salesman that he and his wife had dogs.  Thus, they needed a "durable" flooring material that would hold up to scratching.  The Lumber Liquidators' salesman recommended the Kensington Manor Warm Springs Chestnut 12mm laminate. He said it was a "durable" flooring and that it would be "no problem" holding up to dogs. Mr. Moylen relied upon the above-referenced representations in making his decision to purchase this product from Defendant. However, soon after installation, Mr. Moylen noticed scratching, fading, and peeling of his flooring. Mr. Moylen has used Defendant's product as it was intended to be used for normal

residential traffic, but the flooring does not withstand normal wear and tear during normal use and has failed and deteriorated long before its advertised useful life. Mr. Moylen would not have purchased the Kensington Manor Warm Springs Chestnut 12mm laminate product had he known that it was defective, not durable, and had an inferior ability to withstand abrasion, scratches, fading and peeling.

97.     On the two occasions that he purchased his flooring, Mr. Moylen received two-page invoices.  The first page of the invoices mentioned a "30 year warranty."  The second page of the invoices recited a disclaimer of all other implied and express warranties, but did not mention the warranty of merchantability.  The second page of the invoice included a signature line but it was left blank.

98.     On or about November 11, 2013, Plaintiff Kelly Ryan purchased Kensington Manor Sandy Hills Hickory 12mm laminate flooring from Lumber Liquidators' store located in Henderson, Nevada.  Defendant's webpage for Kensington Manor Sandy Hills Hickory represents that "Kensington Manor is a premium 12mm + 3mm pre-glued underlayment laminate product line."  The landing page immediately before the page for the Kensington Manor Sandy Hills Hickory laminate product stated that Lumber Liquidators' laminate flooring is "very durable and scratch resistant."  Defendant's webpage also advertises that this product has an AC rating of "AC3" and a 30 year warranty.  The label on this product's packaging also displayed prominently that it had a "30 -Year Warranty," which Ms. Ryan saw when she purchased this product.  Ms. Ryan researched this product on Defendant's website and read that this product was a "premium" product and would last for at least 30 years.  On the day of her purchase, Ms. Ryan told the Lumber Liquidators' salesman she had a dog and was concerned about the floor's ability to withstand scratches.  Ms. Ryan relied upon the above-referenced representations in

making her decision to purchase this product from Defendant.  However, within a week after

installation, Ms. Ryan noticed warping, cupping and peeling of the surface of the flooring.  Ms.

Ryan has used Defendant's product as it was intended to be used for normal residential traffic,

but the flooring does not withstand normal wear and tear during normal use and has failed and

deteriorated long before its advertised useful life.  The laboratory testing of Ms. Ryan's laminate

floor resulted in an abrasion rating of AC1, when in fact it was advertised by Lumber Liquidators

as having an abrasion rating of "AC3."  Ms. Ryan would not have purchased the Kensington

Manor Sandy Hills Hickory laminate product had she known that it was defective, not durable,

and had an inferior ability to withstand abrasion, scratches, stains, and edge curling.

      99.     At the time she purchased her flooring, Ms. Ryan received two separate two page

invoices.  The first page of both invoices mentioned a "30-year warranty."  The second page of

both invoices recited a disclaimer of all other implied and express warranties, but did not

mention the warranty of merchantability.  The second page of both invoices included a signature

line but it was left blank.

      100.    On or about October 5, 2013, Plaintiff Karen Hotaling purchased St. James

Vintner's Reserve 12mm laminate flooring from Lumber Liquidators'  website. Plaintiff

researched this product on Lumber Liquidators' website, which represented "At 12mm, the St.

James Collection is very durable and comes with a 30 year warranty!" The website also

represents that the "St James Collection Advantages" include "AC Rating: 3" and a "30 Year

Warranty."  The landing page immediately before the page for the St. James Vintner's Reserve

laminate product stated that Lumber Liquidators' laminate flooring is "very durable and scratch

resistant."  Plaintiff saw the AC3 rating on Defendant's website and relied upon it, because

Plaintiff has 2 large dogs and durability was an important criteria to Plaintiff in selecting a

flooring product.  Plaintiff also relied upon the AC3 representation on Defendant's website in making her decision to purchase this product. However, within days after installation, Plaintiff noticed dents and dings in the flooring, and after one month, she noticed buckling, warping, and staining of her floors. Laboratory testing on Defendant's St. James Vintner's Reserve laminate flooring reveals it only has an AC rating of 1. Plaintiff has used Defendant's product as it was intended to be used for normal residential traffic, but the flooring does not withstand normal wear and tear during normal use and has failed and deteriorated long before its advertised useful life. Plaintiff would not have purchased the St. James Vintner's Reserve laminate product had she known that it was defective, not durable, and had an inferior ability to withstand abrasion and buckling.

101.    At the time she purchased her flooring Ms. Hotaling received a two page invoice. The first page of the invoice mentioned a "30 year warranty." The second page of the invoice recited a disclaimer of all other implied and express warranties, but did not mention the warranty of merchantability. The second page of the invoice included a signature line but it was left blank.

102.    On or about March 31, 2014, Plaintiff Logan Perel purchased Kensington Manor Imperial Teak 12mm laminate flooring from Lumber Liquidators' store #1061 located in Lorton, Virginia.  On the day of his purchase, Mr. Perel visited Defendant's store in Lorton and spoke to a salesman, who told Mr. Perel that the laminate flooring product he has selected as more durable than hardwood, and would not scratch from a pet's nails.  Mr. Perel and his wife were also told by this salesman about the AC3 rating of their flooring by the salesman at the time of their purchase.  Mr. Perel relied upon these representations in making his decision to purchase this product.  However, shortly after installation, Mr. Perel noticed his floor began to swell and warp. Mr. Perel has used Defendant's product as it was intended to be used for normal residential

traffic, but the flooring does not withstand normal wear and tear during normal use and has failed and deteriorated long before its advertised useful life.  Mr. Perel would not have purchased the Kensington Manor Imperial Teak laminate product had he known that it was defective, not durable, and had an inferior ability to withstand abrasion and edge curl.

103.     At the time he purchased his flooring, Mr. Perel received a four page invoice. The first three pages of the invoice mentioned a "30-year warranty."  The last page of the invoice recited a disclaimer of all other implied and express warranties, but did not mention the warranty of merchantability.  The last page of the invoice included a signature line but it was left blank.

104.     Plaintiffs have suffered injury in fact and loss of money or property.  They have been damaged in the amount they paid for their defective and inferior grade of laminate flooring, and must pay to remove and replace their defective and damaged flooring.

## CLASS ALLEGATIONS

105.     This action may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23.  The Class is sufficiently numerous, since it is estimated to include tens of thousands of consumers, the joinder of whom in one action is impracticable, and the disposition of whose claims in a class action will provide substantial benefits to the parties and the Court.

106.     Class Definition:  Without prejudice to later revisions, the classes which Plaintiffs seek to represent is composed of (collectively, the "Class"):

**The National Class:** All Persons in the United States who purchased the Laminates from Lumber Liquidators for personal use in their homes.

## Or In The Alternative

**The Alabama Class:**  (represented by Erin Florez)

All persons in Alabama who purchased the Laminates from Defendant for personal use in their home.

**The California Class**: (represented by Jim Moylen)

All persons in California who purchased the Laminates from Defendant for personal use in their homes.

**The Nevada Class**: (represented by Kelly Ryan)

All persons in Nevada who purchased the Laminates from Defendant for personal use in their homes.

**The New York Class:**  (represented by Karen Hotaling)

All persons in New York who purchased the Laminates from Defendant for personal use in their home.

**The Virginia Class**: (represented by Logan Perel)

All persons in Virginia who purchased the Laminates from Defendant for personal use in their home.

107.   Excluded from the Class are governmental entities, Defendant, its affiliates and subsidiaries, Defendant's current and former employees, officers, directors, agents, representatives, their family members, and the members of this Court and its staff.

108.   Throughout discovery in this litigation, Plaintiffs may find it appropriate and/or necessary to amend the definition of the Class.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

109.   Ascertainable Class:  While Plaintiffs do not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are tens, if not hundreds of thousands of Class Members.  The precise number of members can be ascertained through discovery, which will include Defendant's sales, service and other business records.

110.   Common Questions of Law and Fact Predominate:  There is a well-defined community of interest among the Class.  The questions of law and fact common to the Class

predominate over questions that may affect individual Class Members.  These questions of law and fact include, but are not limited to, the following:

a.   Whether Defendant exercised reasonable care in testing the durability and abrasion rating for its laminate flooring prior to its release for commercial sale;

b.   Whether Defendant's laminate flooring is defective when used as intended or in a reasonably foreseeable manner;

c.   Whether Defendant's laminate flooring has an AC Rating less than AC3;

d.   Whether Defendant's laminate flooring was fit for its intended purpose;

e.   Whether Defendant has breached the implied warranty of fitness for a particular purpose;

f.   Whether Defendant has breached the implied warranty of merchantability;

g.   Whether Defendant has acted negligently;

h.   Whether Defendant knew that its laminate flooring was defective and had an Abrasion Class rating of less than AC3;

i.   Whether Defendant omitted and concealed material facts from its communications and advertising to Plaintiffs regarding the durability of its laminate flooring;

j.   Whether Defendant falsely advertised that its laminate flooring products were "AC3" rated, "very durable," and "very scratch-resistant," when in fact they were not;

k.   Whether Defendant's misrepresentations or omissions constitute unfair or deceptive practices under the respective consumer protection statutes of each of the states represented herein;

l.      Whether Plaintiffs and Class Members have been harmed and the proper measure of relief;

m.     Whether Plaintiffs and Class Members are entitled to an award of punitive damages, attorneys' fees and expenses against Defendant; and

n.     Whether, as a result of Defendant's misconduct, Plaintiffs are entitled to equitable relief, and if so, the nature of such relief.

111.    <u>Numerosity</u>:  The Class is so numerous that the individual joinder of all members of the Class is impractical under the circumstances of this case.  While the exact number of members of the Class is unknown to Plaintiffs at this time, Plaintiffs are informed and believe the Class consists of thousands of persons. Individual joinder of Members of the Class is also impracticable because the individual Members are dispersed throughout Alabama, California, Nevada, New York and Virginia.

112.    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the proposed class.  Plaintiffs and all Class Members have been injured by the same wrongful practices of Defendant.  Defendant made the same uniform representations on its website and on the labels affixed to their product packaging.  Plaintiffs are informed and believe that these representations were made by Defendant nationally, on its website, product packaging, and other forms of advertisements which were identical in each state represented herein.  Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories.

113.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.  Plaintiffs seek no relief that is antagonistic or adverse to the

members of the Class and the infringement of the rights and the damages they have suffered are typical of all other Class Members.  Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel.

114.  <u>Superiority</u>:  The disposition of Plaintiffs' and Class Members' claims in a class action will provide substantial benefits to both the parties and the Court.  The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because:

a.   The individual amounts of damages involved, while not insubstantial, are such that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b.   If each Class Member was required to file an individual lawsuit, the Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with vastly superior financial and legal resources;

c.   The costs of individual suits could unreasonably consume the amounts that would be recovered;

d.   Given the size of individual Class Members' claims and the expense of litigating those claims, few, if any, proposed Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them and absent proposed Class Members have no substantial interest in individually controlling the prosecution of individual actions;

e.      This action will promote an orderly and expeditious administration and adjudication of the proposed class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

f.      Without a class action, proposed Class Members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendant continues to reap and retain the substantial proceeds of its wrongful conduct;

g.      Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action;

h.      Proof of a common business practice or factual pattern which Plaintiffs experienced is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the causes of action alleged; and

i.      Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

115.    Plaintiffs and Class Members have all similarly suffered irreparable harm and damages as a result of Defendant's unlawful and wrongful conduct.  This action will provide substantial benefits to Plaintiffs, the Class and the public because, absent this action, Plaintiffs and Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain proceeds of its ill-gotten gains.

/ / /

/ / /

22872.1                                             30

## FIRST CAUSE OF ACTION

### Breach of Implied Warranties

### (By All Plaintiffs and All Classes)

116.    Plaintiffs and All Classes incorporate by reference each and every preceding paragraph of this Representative Complaint as if fully set forth herein.

117.    By placing the Laminates in the stream of commerce, Defendant impliedly warranted that its products were merchantable, fit for their intended purpose, and suitable for residential use.

118.    The Laminates are not merchantable.  In breach of the implied warranty of merchantability, the Laminates are defective because they does not have an AC rating of AC3, prematurely fail due to scratches, impacts, warping, fading, stains, and edge curling and are not suitable for general residential use.

119.    The Laminates are not fit for their intended purpose of residential use due to their lack of durability.  Defendant knew or had reason to know that Plaintiffs and the Class purchased the Laminates for the particular purpose of residential flooring use, and thus impliedly warranted that particular use.

120.    The Laminates were defective when they left Defendant's control and entered the market.

121.    The Laminates' defects were not open and/or obvious to consumers.

122.    Any purported disclaimer or limitation of the duration and scope of the implied warranty of merchantability given by Defendant is ineffective, not conspicuous, unreasonable, unconscionable, and void, because Defendant knew or recklessly disregarded that the defect in the Laminates existed and might not be discovered, if at all, until the flooring had been used for a period of time, and Defendant willfully withheld information about the defect from purchasers of

flooring.  Moreover, due to the unequal bargaining power between the parties, Plaintiffs and

Class Members had no meaningful alternative to accepting Defendant's attempted *pro forma*

limitation of the duration of any warranties.

123.    Defendant received notice that the Laminates were not merchantable through its

own product testing, its "robust Quality Assurance program," and numerous customer

complaints, well before Plaintiffs and Class Members filed suit.

124.    As a result, Plaintiffs and all Class Members have been damaged in, *inter alia,* the

amount they paid to purchase and replace Defendant's un-merchantable laminate flooring.

**SECOND CAUSE OF ACTION**

**Fraudulent Concealment**

**(By All Plaintiffs and All Classes)**

125.    Plaintiffs incorporate by reference each and every preceding paragraph of this

Representative Complaint as if fully set forth herein.

126.    Defendant represented on its website that its St. James Collection line of laminate

flooring products is "very durable" and the "St. James Collection's Advantages" include an

Abrasion Class rating of "AC3" and a "30 Year Warranty."  Defendant also represented that its

Kensington Manor Collection line of laminate flooring products is a "premium 12 mm" laminate

product line and that the "Kensington Manor Collection Advantages" include an AC rating of

AC3 and a "30 Year Warranty."  Defendant represented on its website that its Ispiri Collection

line of laminate flooring "has raised the bar on . . .  durability."  Defendant's website also

represents the "Ispiri Collection's Advantages" include an AC rating of AC3 and a 30-year

warranty.  Further, the product packaging of all of Defendant's Dream Home brand of laminate

flooring states it comes with a "30-Year Warranty."

127.     Plaintiffs are informed and believe that Lumber Liquidators knew, or recklessly disregarded that the Laminates were defective based upon literally hundreds of complaints posted by Lumber Liquidators' customers on websites, including but not limited to, www.ths.gardenweb.com, www.consumeraffairs.com, www.complaintlist.com, www.my3cents.com and others describe scratching, bubbling, delaminating, peeling, and curling of Lumber Liquidators' Dream Home laminate flooring identical to the damages suffered by the Plaintiffs herein.

128.     For example, on June 1, 2005, "kitchenlover" posted the following question on www.ths.gardenweb.com: "Anyone used the Dream Home laminate from LL?"

129.     On or about September 14, 2005 "pat111153" responded to the above-referenced question by posting the following, in relevant part, on www.ths.gardenweb.com: ". . . chips show up on edges later . . . ."

130.     On or about January 25, 2007, "sammyswife" posted the following another response on www.ths.gardenweb.com:

I HATE this flooring!! Does anyone have the Dream Home parent company info?  LL is no help! The salesman incorrectly told us how to install it.  After a year of it being down, we are ripping it up because it looks horrible!  It chips and peels and is awful! LL blames our installation, but thanks to their own people, we cannot get anywhere with the so-called warranty. I want to write the company directly and can't seem to find them anywhere. If anyone knows a link or number of where I can call, please email me at [redacted for privacy], thanks!

131.     On or about June 12, 2011 "grandpe02" posted his/her response on www.ths.gardenweb.com:

I recently perchased (*sic*) 1000sq ft. of dream home French oak.  Big mistake.  LL was no help at all. The boards were very warped and chipped after laying.  And it can't be cleaned without leaving streaks. And seems LL they have never heard this from anyone before. Wish I would have checked out the internet first. This stuff is garbage . . . .

132.     On or about April 11, 2013, "poorchoice" posted his response on www.ths.gardenweb.com as follows:

Finished laying Dream Home Nirvana Plus on Saturday. Job went well and Wife was pleased. Floor was beautiful with tight joints and a warm rich color.  While  replacing furniture, Wife dragged a plant with a plastic saucer under it and made some scratches across the middle of the room.  Scratches are not too bad, but raised suspicions.  I moved the recliner, which has plastic pads on it to find that in just 4 days the laminate is worn through the "warm rich color." Wife says the salesman said that this stuff wont scratch with anything but a knife.  LL warrants it for foot traffic for 25 years, so I guess you are supposed to keep it covered except where you walk.  I have some question about its longevity since the recliner wore through to white in 4 days . . . .

133.    On or about November 4, 2013, "KDraper" posted his response as follows on

www.ths.gardenweb.com:

We had this product professionally installed. HATE it. Six months after it was put in we started seeing areas delaminate. Some were high traffic some were low/no traffic…We contacted the company through LL.  Their answer was we our area was either too wet or too dry and it wasn't their problem that we had almost 1000sf of this flooring that looked like crap.  I will never use LL again . . . .

134.    On www.complaintslist.com "Pat" wrote on April 23, 2013:

When we went there, we were met by the store manager, "Dave" (He was very sick at the time, remember!) and informed him we were looking for a floor that would not scratch as we had two small dogs. Dave showed us some flooring samples and said to us, "it will not scratch from your dogs, I have a dog and the same flooring in my house and mine has no scratches."  Well not more than two weeks after it was installed, we noticed scratches on the floor.

135.    On www.mythreecents.com, "AllenB" wrote on November 23, 2009:

Spent almost 10,000 dollars on a prefinished floor by Lumber Liquidators. After only a week of normal use I notices serious scratching.  I took closer notice and marked over 100 scratches on these floors, many all the way through the finish!  Three salesman we spoke to before buying this product all answered the same questions we asked, "Will our dogs or children scratch this floor with their normal use?"  They assured me we would have no problem, explained how these floors are ideal with pets and even gave us promotional material that showed a large dog on this floor.

136.    On www.mythreecents.com, "JR in Arizona" wrote on March 20, 2010:

In 2007 I bought the Asian Birch Flooring. Within 6 months it started to delaminate. It is engineered wood flooring. I finally made a complaint to LL asking for repairs where the floor is clearly separating from the wood backing . . . .  After a week they sent me a letter saying they were not responsible. I guess they get to rewrite their warranties as they please.

137.     In response to this complaint, Lumber Liquidators posted the following response

on March 29. 2010, proving it was monitoring customer complaints on this website:

If we had someone take photos of the flooring it would have been in support of your warranty as a need to hold a manufacturer accountable for quality should a defect be found. Flooring will react to changing conditions and we not the invoice, warranty and installation instructions, as well as some boxes also note requirements for maintaining ideal conditions.  The problem is most consumers don't read this information until a problem occurs . . . a little too late, then expect LL to compensate for issues out of our control . . . .  In some situations we even send a complimentary box to help with repairs, but it sounds like the problem was not with the flooring, but rather some installation or site condition . . . .  I'm sorry to hear this lead to some dissatisfaction as the problem would be the same no matter where you shopped; you would most likely pay more elsewhere.  Read the information provided _ Dan Gordon often provides some good advice as well with his replies – Bob Villa also knows how important it is to read the installation instructions/warranty.

138.     On www.consumeraffairs.com, Lana of Trabuco Canyon, CA wrote on August 6,

2015:

Warranty claim unresolved due to company unresponsiveness spanning 8 months. We noticed some surface chipping away on a little area in the formal living room that we rarely use. It had been only 2.5 years from purchasing the engineered wood with a 30 year warranty. We initiated the warranty process with the worst encounters of customer service that I have experienced. For the last 8 months we have experienced months of delays, avoidance, ignored, and being forwarded to multiple customer service representatives. Matt, representative of Lumber Liquidators stated that it was impossible that it was Lumber Liquidator's faulty wood and that it was the installers fault just by looking at the pictures.

I researched online regarding warranty claims of customers of Lumber Liquidators and that it is their reasoning to other customers regarding warranty claims. Note this is prior to any inspection that Matt came to the conclusion. Rather insulting when myself and fiancé had to deal with 8 months of delays, avoidance, being ignored, and being forwarded to multiple customer service representatives just to have him state that via e-mail. We're taking them to small claims court but, I just want potential customers or customers their actual warranty practices and poor customer service because Lumber Liquidators advertises warranty and customer service as their key points to why customers go to them.

139.     On www.consumeraffairs.com Will of Sandia Park, NM wrote on June 10, 2015:

We purchased America's Mission Olive 12mm laminate flooring from Lumber Liquidators in December of 2014 and had it installed throughout our home (except bathrooms) in our new remodel. We chose this floor after speaking with their sales people who convinced us that this is a very durable floor, which would hold up great to pets and kids. We had the floors installed by a professional and were very happy with the results for about a month. That was when we started noticing the chips all over the floor and the bubbling along the edges of the

planks. If a drop of liquid came into contact with these floors, even if wiped up immediately, the surface of the product would start to peel away from the backing. And anytime anything was dropped on the floor they would chip.

We were extremely disappointed because these floors had been sold to us as being extremely durable and multiple employees at the Albuquerque store told us that they would be great for a family with pets and kids. We contacted their customer care line, sure that they would make this right since this was obviously a misrepresentation of the product they were selling. We figured that a company this large would have some pride in their products and stand behind what they sold. Unfortunately this has not been the case at all.

After jumping through hoops we were told to send them a box of our unopened flooring. We did this and a few days later we contacted with an "it's not our fault" letter. They said that they had done internal testing and that based off of the pictures we had sent them and their "internal testing" it was moisture damage. The funny thing is that we didn't even send pictures of the bubbling from moisture, we had just send pictures of the chipping. This showed us that they hadn't even bothered to review our claims before writing us off!!

After this, we requested to see the report on our floors from their "internal tests" and were told "there is no report, just a notation made on the file that the issues of concern are not manufacturing related. I don't know what the inspection process is except for what I have already shared with you as this is done by a separate entity." ARE YOU KIDDING ME?? What reputable, ethical company runs "internal testing" and doesn't document it? At this point we were very frustrated with the company because it is obvious that they have been giving us the runaround. So after many more emails and calls (most of which were never even acknowledged) we were told they would send out a "third party inspector." The inspector finally came and took some pictures and moisture readings and left without giving us any information.

We were contact by Lumber Liquidators a few days later with another not saying it is all moisture related and not their fault. However, their own warranty states that "Your Ispiri floor is warranted against finish wear from normal household conditions resulting in exposure of the paper layer." This is exactly what is happening in our home! We have since asked multiple times to see a copy of the report be the "third party inspector" and have been ignored. We have also requested multiple times to speak with a supervisor, only to be ignored each time.

I would never recommend Lumber Liquidators to anyone. In fact, I will be doing just the opposite. For the amount of money we spent it would be nice if they would stand behind their product and make sure their customers were satisfied and that they were selling good quality product, but unfortunately this is not the case at all.

140.    Plaintiffs are informed and believe that Lumber Liquidators' website advertising

of the Laminates includes a video testimonial which features a family with two dogs and two

cats, and the Lumber Liquidators' salesman shown on that video claims, "Kensington Manor has

a high, high durability factor. That's something people are looking for when they have animals."

The screen shot of the video depicting a large dog appears on every webpage for the Dream Home line of laminate flooring products, implying that these products are durable enough to withstand scratches from pet traffic.

141.     Defendant concealed and suppressed material facts concerning the durability of its Dream Home laminate flooring products. Defendant failed to disclose that its Dream Home laminate flooring products were defective, not AC3 rated, not "very durable," were not "premium" and would scratch, fade, stain, bubble, delaminate and curl during ordinary residential foot and pet traffic.  As alleged above, the Laminates were defective, were of a lesser quality than advertised and had an inferior ability to withstand abrasion than advertised.  These facts were not known to Plaintiffs and the Class at the time of their purchase.  These omitted and concealed facts were material because they directly impact the useful life and durability of the products.

142.     Alternatively, Defendant intentionally failed to disclose the fact that the Laminates were defective in that they were not fit for their intended use, a fact only known to Defendant.  Plaintiffs and the Class could not have discovered it through the exercise of reasonable diligence.  Plaintiffs are informed and thereon believe that Defendant knew of the durability defects of the Laminates from its product testing and Defendant's self-proclaimed "robust Quality Assurance program" performed prior to placing the laminate flooring products into the stream of commerce.

143.     Plaintiffs and the Class reasonably relied and continue to rely upon Defendant to sell laminate wood flooring products which are merchantable.  Defendant knew or ought to have known that Plaintiffs and the Class relied and/or would have reasonably relied upon Defendant to sell laminate wood flooring products in which the entire lifetime of the goods could be fully used

without prematurely becoming damaged and/or failing.  Defendant's knowledge that the Laminates were not fit for their intended use, combined with Defendant's knowledge that Plaintiffs and the Class relied upon Defendant to communicate the true durability, or lack thereof, of its laminate flooring products creates a legal obligation on Defendant's part to disclose to Plaintiffs and the Class these facts.  Defendant is in a superior position to know the truth about, and the nature of, the durability and useful life of its laminate flooring products.

144.    Defendant intended to deceive Plaintiffs and the Class by failing to disclose that the Laminates are not fit for their intended purpose, will fail prematurely long before the end of the 30-year warranty period, were not "very durable," and do not have an AC3 rating.

145.    Defendant's failure to disclose these facts was material.  Plaintiffs and the Class would not have purchased their laminate flooring had they known that their laminate flooring products were not fit for their intended use, would prematurely fail long before the end of the 30-year warranty period, were not "very durable," and did not have an AC3 rating.

146.    Plaintiffs and the Class were harmed.  As a proximate result of Defendant's conduct as set forth in this cause of action, Plaintiffs and the Class will now be required to remove and replace their defective and damaged laminate flooring.

147.    Defendant's concealment was a substantial factor in causing that harm.

148.    The wrongful conduct of Defendant, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious, and/or in conscious disregard for the wellbeing of Plaintiffs and the Class.  Defendant intended to cause injury to the Plaintiffs and the Class placing profits over providing a higher quality product which was advertised to the Plaintiffs.  Defendant engaged and continues to engage in despicable conduct with a willful and conscious disregard of the rights or safety of others.  Defendant subjected, and

continues to subject, Plaintiffs and the Class to cruel and unjust hardship.  Accordingly, Plaintiffs

and Class members are entitled to an award of punitive damages against Defendant in an amount

to deter it from similar conduct in the future.

### THIRD CAUSE OF ACTION

**Violation of The Magnuson-Moss Warranty Act
15 U.S.C. §§ 2301, et seq.**

**(By All Plaintiffs and All Classes)**

149.    Plaintiffs incorporate by reference each and every preceding paragraph of this

Representative Complaint as if fully set forth herein.

150.    Plaintiffs bring this claim on their own behalves and on behalf of each member of

the Class described above.

151.    Plaintiffs and the other members of the Class are "consumers" within the meaning

of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

152.    Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15

U.S.C. § 2301(4)-(5).

153.    Lumber Liquidators' Dream Home proprietary line of laminate flooring products

was purchased separate and apart from the initial construction of the homes of the Plaintiffs and

the members of the Classes into which it was installed and constitutes a "consumer product"

within the meaning of 15 U.S.C. § 2301(1).

154.    Pursuant to section 2308(a) of the Magnuson-Moss Warranty Act, "No supplier

may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer

product if (1) such supplier makes any written warranty to the consumer with respect to such

consumer product . . . ."

155.     Furthermore, section 2308(c) provides that "A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law."

156.     Lumber Liquidators' express warranties and written affirmations of fact regarding the durability and level of performance over time of the Laminates constitutes a written warranty within the meaning of 15 U.S.C. § 2301(6)(A).

157.     Lumber Liquidators breached its warranties (express and implied) by manufacturing, selling, and/or distributing the Laminates that are not "very durable," not "scratch resistant," which fail prematurely long before the expiration of the stated warranty duration, and have an Abrasion Class rating below "AC3," without knowledge of the truth of such representations.

158.     Defendant further violated 15 U.S.C. § 2302 by failing to make a full and conspicuous disclosure of the terms and conditions of the 30-year warranty advertised on Defendant's website, on page 1 of the Invoices in the product description, of Laminates sold to the Plaintiffs and Class members .

159.     Lumber Liquidators breached its warranties to Plaintiffs and Class members because these written affirmations of fact or written promises made in connection with the sale of the Laminates relate to the nature of the material and affirms or promises that such material will meet a specified level of performance over a specified period of time and in fact fail to do so.  15 U.S.C. § 2301(6)(A).

160.     Lumber Liquidators' breach deprived Plaintiffs and Class members of the benefit of their bargain.

161.    The amount in controversy of Plaintiffs' individual claims exceeds the value of $25.  In addition, the amount in controversy exceeds the value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this action.

162.    Defendant has been notified of its breach of written warranties and has failed to adequately cure those breaches.  Defendant has had adequate and reasonable opportunity to cure its breaches of or fulfill its warranty obligations, but has failed to do so.

163.    In or about June of 2016, Plaintiff, Jim Moylen, provided notice of the defects (*i.e.*, scratches in the flooring) to one of Defendant's salespersons at his local store in Rancho Cordova, California.  The salesperson informed Plaintiff's wife that he did not know why Plaintiff was having problems with his flooring.  The representative did not offer Plaintiff, Jim Moylen, replacement flooring or any other corrective action.

164.    Pursuant to the provisions of 15 U.S.C. § 2310(e), in the case of a class action (as is the case here), Plaintiffs will provide Defendant with notice and a further reasonable opportunity to cure, once the representative capacity of the named Plaintiffs has been established in the application of Rule 23 of the Federal Rules of Civil Procedure.

165.    As a direct and proximate result of Defendant's breaches of its written warranties, Plaintiffs and Class members sustained damages in amounts to be determined at trial.

## FOURTH CAUSE OF ACTION

### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*

### (By Plaintiff Jim Moylen and the California Class)

166.    Plaintiff Moylen and the California Class incorporate by reference each and every preceding paragraph of this Representative Complaint as if fully set forth herein.

167.     The acts, omissions, and practices of Defendant as alleged herein constituted, and continue to constitute, unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"). Plaintiff Moylen has standing to bring this action under the UCL because he has suffered injury in fact and has lost money because of the Defendant's conduct.

168.     Defendant has engaged in "unlawful" business acts and practices by its violation of the statutes and regulations, referenced above, including, but not limited to: California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA"); and California common law that prohibits fraudulent concealment and breaches of implied warranty.

169.     Defendant has also engaged in "unfair" business acts or practices in that the harm caused by Defendant's misrepresentation about the durability of its laminate flooring outweighs the utility of such conduct and the conduct offends public policy, is immoral, unscrupulous, unethical, deceitful and offensive, causes substantial injury to Plaintiffs and the Class, and provides Defendant with an unfair competitive advantage over those companies that abide by the law.

170.     Defendant's actions described herein constitute fraud within the meaning of the UCL in that Defendant has failed to disclose that the Laminates are defective, because they do not have an AC rating of AC3, are not "very durable," and will prematurely fail long before the end of the 30-year warranty period.  Defendant's failure to disclose the true facts concerning the durability of its laminate flooring was likely to mislead Plaintiffs and the Class into believing that the Laminates had a higher abrasion rating than they actually did, were "very durable," and would last at least as long as the 30-year warranty.  Plaintiffs' laminate flooring has failed,

become scratched, marred, warped, stained, and has failed after being put to its intended use for residential traffic.

171.    As a result of the conduct described above, Defendant has been and will be unjustly enriched at the expense of Plaintiffs and the Class.

172.    The aforementioned unlawful or unfair business acts or practices conducted by Defendant has been committed in the past and continues to this day.  Defendant has failed to acknowledge the wrongful nature of its actions.  Defendant has not corrected or publicly issued individual and comprehensive corrective notices to Plaintiffs and the Class or provided full restitution and disgorgement of all ill-gotten monies either acquired or retained by Defendant as a result thereof, thereby depriving Plaintiffs and the Class of laminate flooring that has the durability qualities advertised by Defendant.

173.    Pursuant to the Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class seek an order of this Court requiring Defendant to disgorge all ill-gotten gains and awarding Plaintiffs and the Class full restitution of all monies wrongfully acquired by Defendant by means of such unlawful, unfair, and fraudulent conduct, plus interest and attorneys' fees pursuant to, *inter alia*, Cal. Code Civ. P. § 1021.5, so as to restore any and all monies to Plaintiffs and the Class and the general public, which were acquired and obtained by means of such unlawful, unfair, and fraudulent conduct, and which ill-gotten gains are still retained by Defendant.  Plaintiffs and the Class additionally request that such funds be impounded by the Court or that an asset freeze or constructive trust be imposed upon such monies by Defendant.  Plaintiffs and the Class may be irreparably harmed and/or denied and effective and complete remedy if such an order is not granted.

/ / /

## FIFTH CAUSE OF ACTION

### Violations of California's False Advertising Law
### Cal. Bus. & Prof. Code § 17500, *et seq.*

### (By Plaintiff Jim Moylen and the California Class)

174.   Plaintiff Moylen and the California Class incorporate by reference each and every preceding paragraph of this Representative Complaint as if fully set forth herein.

175.   The FAL prohibits various deceptive practices in connection with the dissemination in any manner of representations that are likely to deceive members of the public to purchase products such as the Laminates.

176.   Defendant caused advertisements for the Laminates to be placed on its website and product packaging before the general public and knew or should have known the Laminates did not conform to the advertisements' representations regarding their durability.

177.   As a result of the foregoing, Plaintiffs and Class Members are entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Violation of California's Consumers Legal Remedies Act
### Cal. Civ. Code § 1750, *et seq.*

### (By Plaintiff Jim Moylen and the California Class)

178.   Plaintiff Moylen and the California Class incorporate by reference each and every preceding paragraph of this Representative Amended Complaint as if fully set forth herein.

179.   This cause of action arises under the CLRA.  Plaintiff Moylen is a "consumer" as defined by Cal. Civ. Code § 1761(d).  Defendant's Laminates constitute "goods" as defined by Cal. Civ. Code § 1761(a).  At all times relevant hereto, Defendant constituted a "person" as that term is defined in Cal. Civ. Code § 1761(a), and Plaintiffs' and Class Members' purchases of the Laminates constituted "transactions" as that term is defined in Cal. Civ. Code § 1761(b).

180.    Defendant violated and continues to violate the CLRA by engaging in the following deceptive practices specifically proscribed by Cal. Civ. Code § 1770(a), in transactions with Plaintiffs and Class Members that were intended to result or which resulted in the sale or lease of goods or services to consumers:

      a.    In violation of Cal. Civ. Code § 1770(a)(5), Defendant's acts and practices constitute misrepresentations that the Laminates have characteristics, benefits or uses which they do not have;

/ / /

      b.    In violation of Cal. Civ. Code § § 1770(a)(7), Defendant has misrepresented that the Laminates are of a particular standard, quality and/or grade, when they are of another;

      c.    In violation of Cal. Civ. Code § 1770(a)(9), Defendant advertised the Laminates with the intent not to sell them as advertised or represented;

      d.    In violation of Cal. Civ. Code § 1770(a)(14), Defendant misrepresented that the Laminates conferred or involved rights, remedies, or obligations that they did not have; and

      e.    In violation of Cal. Civ. Code § 1770(a)(16), Defendant misrepresented that the Laminates were supplied in accordance with previous representations when they were not.

181.    Defendant has made uniform representations that the Laminates have an "AC3" Abrasion Class rating, are "very durable," and has implied that the useful life of its products is at least as long as the 30-year warranty.  These representations, as set forth above, were false, deceptive, and/or misleading and in violation of the CLRA.

182.     Pursuant to Cal. Civ. Code § 1782, Plaintiffs notified Defendant in writing by overnight mail on July 25, 2016 of the particular violations of Cal. Civ. Code § 1770 alleged herein, and have demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.  Plaintiffs sent this notice by overnight mail, to Defendant's principal place of business.

183.     On August 25, 2016, Defendant responded to Plaintiffs' notice above and rejected Plaintiffs' claims that it had violated the CLRA.  Plaintiffs seek actual damages and punitive damages for violation of the Act.  In addition, pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiffs will be entitled to, and therefore seek, a Court order enjoining the above-described wrongful acts and practices that violate Cal. Civ. Code § 1770.

184.     Plaintiffs and the Class will also be entitled to recover attorneys' fees, costs, expenses and disbursements pursuant to Cal. Civ. Code §§ 1780 and 1781.

## SEVENTH CAUSE OF ACTION

### Violation of the Alabama Deceptive Trade Practices Act

### Alabama Code § 8-19-1, *et. seq.*

### (By Plaintiff Erin Florez and the Alabama Class)

185..     Plaintiff, Erin Florez, on behalf of herself, and all others similarly situated, adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

186.     Defendant's actions and/or omissions as described herein violated Alabama Code § 8-19-1, et. seq. (the "ADTPA"), which was enacted to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising in the conduct of any business, trade or commerce.

187.    The ADTPA, Alabama Code § 8-19-5, provides, in pertinent part, as follows:

**Unlawful trade practices.**

The following deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:

(2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(3) Causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(21) Intentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies.

188.    Specifically, Defendant knowingly misrepresented and intentionally omitted material information regarding its Dream Home laminate flooring by representing in its advertisement that its flooring had an Abrasion Rating of AC3 when it does not.

189.    Defendant's misrepresentations and concealment of material facts concerning the Laminate's Abrasion Rating constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression or omission in connection with the sale and use of Defendant's Dream Home laminate flooring in violation of Alabama Code § 8-19-1, et. seq.

190.    Defendant violated Alabama Code § 8-19-1, et. seq., by knowingly and falsely representing in its advertisement that its Dream Home laminate flooring had an Abrasion Rating of AC3 and was fit to be used for the purpose for which it was intended, when Defendant knew

or was reckless in not knowing that it was defective, unreliable, and had a lower Abrasion Rating and by other acts alleged herein.

191.    Alabama has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices such as those alleged in this Complaint.

192.    As a direct and proximate result of Defendant's violation of Alabama Code § 8-19-1, et. seq. and other similar statutes, Plaintiffs and the Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**EIGHTH CAUSE OF ACTION**

**Violation Of Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. §41.600 and §598.0915, et seq.**

**(By Plaintiff Kelly Ryan and the Nevada Class)**

193.    Plaintiff Ryan and the Nevada Class incorporate by reference each and every preceding paragraph of this Representative Amended Complaint as if fully set forth herein.

194.    Defendant's actions and/or inactions with respect to the sale, promotion, and management of the Laminates represent a violation of Nevada's Deceptive Trade Practices Act ("DTPA").

195.    Lumber Liquidators knowingly made false representations and/or material omissions regarding the characteristics, quality, and benefits of the Laminates, including but not limited to the Abrasion Rating, while actively promoting and selling the Laminates to Plaintiffs and Class Members throughout Nevada and the United States.

196.    The Laminates were represented to the general public as having an Abrasion Rating of AC3 and a quality and standard that met or exceeded EPLF standards.

197.     Lumber Liquidators perpetuated violations of Nevada's DTPA by knowingly and purposely concealing information about the Laminates' Abrasion Rating while continuing to claim it had an AC3 rating and was a high quality product based on its craftsmanship, utility, and Lumber Liquidators' reputation and experience in the laminate flooring industry.

198.     Lumber Liquidators' deceptive acts and practices included the dissemination of material information through television, print, and internet that failed to disclose the known lower Abrasion Rating and defects inherent with the Laminates.

199.     Lumber Liquidators engaged in deceptive trade practices in the course of its business as defined in Nev. Rev. Stat. §598.0915, including but not limited to subsections (2), (3), (5), (7), and (15), in that Lumber Liquidators:

    a.   Knowingly made a false representation as to Abrasion Rating of the Laminates;

    b.   Knowingly made false representation as to the source, sponsorship, approval or certification of the Laminates;

    c.   Knowingly made a false representation as to affiliation, connection, association with or certification by another person;

    d.   Knowingly made a false representation as to the characteristics, uses, and benefits of the Laminates and a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;

    e.   Represented that Laminates were of a particular standard, quality or grade; and

    f.   Knowingly made other false representation in its transactions with the Laminates.

200.     Lumber Liquidators further engaged in deceptive trade practices in the course of its business as defined in Nev. Rev. Stat. §598.0923, including but not limited to subsections (2) and (3), in that Lumber Liquidators:

a.   Knowingly failed to disclose a material fact in connection with the sale of the

Laminates; and

b.   Knowingly violating EPLF standards relating to the sale of the Laminates.

201.   The Plaintiffs and other similarly situated Class Members could have purchased alternative flooring from a manufacturer that had the AC3 Abrasion Rating and was not defective or cause damage to the flooring.

202.   The totality of Lumber Liquidators' deceptive practices and acts are a direct and proximate cause of economic harm against the Plaintiffs and Class Members.

203.   Pursuant to Nev. Rev. Stat. §41.600(3), Plaintiffs and Class Members are entitled all damages sustained, any equitable relief that the Court deems appropriate, and all costs and reasonable attorneys' fees as a result of Lumber Liquidators' violations of Nevada's DTPA.

## NINTH CAUSE OF ACTION

**Unfair And Deceptive Trade Practices In Violation Of
New York General Business Law §§ 349**

**(On Behalf of Plaintiff Karen Hotaling and New York Class Members)**

1.   Plaintiffs, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations as though fully set forth herein.

2.   This is action is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Lumber Liquidators on behalf of Plaintiffs and the Class Members.

3.   Plaintiffs and Class Members are consumers and as owners of properties with Defendant's products attached to them, they are the end users and intended beneficiaries of said products.

4.      As a seller of Dream Home laminate flooring to the consuming public and whose conduct affects similarly situated consumers and has a broad impact on consumers at large, Defendant is engaged in consumer-oriented conduct within the intended ambit of GBL § 349.

5.      Defendant's actions and/or omissions as described herein violated GBL §3490, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

6.      Specifically, Defendant knowingly misrepresented and intentionally omitted material information regarding the Abrasion Rating of its Dream Home laminate flooring by failing to disclose known lower levels than Lumber Liquidators expressly represented.

7.      Defendant also engaged in materially misleading deceptive acts and practices by continuing to sell its Dream Home laminate flooring to the consuming public with knowledge that the flooring would not perform as intended, represented and warranted, and that the flooring had a lower Abrasion Rating than represented and would prematurely fail causing homeowners to incur significant out of pocket costs and expenses in repairing damaged property and replacing their flooring.

8.      Defendant's misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and use of Defendant's Dream Home laminate flooring in violation of GBL §349.

9.      Defendant violated GBL §349 by knowingly and falsely representing that Defendant's Dream Home laminate flooring was fit to be used for the purpose for which it was

intended, when Defendant knew it was defective, unreliable, and unsafe and by other acts alleged herein.

10.     Defendants' deceptive and misleading actions and omissions as set forth herein have caused and continue to cause injury to Plaintiffs and the Class Members.

11.     New York has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices such as those alleged in this Third Amended Complaint.

12.     As a direct and proximate result of Defendant's violations of GBL §349, Plaintiffs and the Class Members have suffered and continue to suffer damages. Plaintiffs and the Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## TENTH CAUSE OF ACTION

### Violation of Virginia Consumer Protection Act
### Va. Code. 59.1-198

### (By Plaintiff Logan Perel and the Virginia Class)

204.     Plaintiff Perel and the Virginia Class incorporate by reference each and every preceding paragraph of this Representative Amended Complaint as if fully set forth herein.

205.     Lumber Liquidators is a "supplier" within the meaning of the Virginia Consumer Protection Act, Va. Code. 59.1-198 (the "VCPA").

206.     Lumber Liquidators engaged in "consumer transactions" with Plaintiffs and Class Members within the meaning of the VCPA.

207.     Plaintiffs and Class Members purchased the Laminates from Lumber Liquidators which constitutes "goods" within the meaning of the VCPA.

208.    Lumber Liquidators misrepresented and continues to misrepresent that its goods have or had certain characteristics, are or were of a particular standard, quality, or grade, and committed and continues to commit various other acts of deception, false pretense, false promise, or misrepresentations in connection with consumer transactions, including, among other things:

a.    Advertising, selling and/or distributing flooring that do not have an Abrasion Rating of AC3 has expressly represented by Lumber Liquidators;

b.    Importing, selling and/or distributing flooring that fails to comply with all applicable EPLF standards;

c.    Making false and misleading statements and omitting to disclose material information regarding defects in Lumber Liquidators' flooring, including but not limited to the lower Abrasion Rating; and

d.    Refusing to properly repair or replace the defective flooring as described herein.

209.    As a direct and proximate result of Lumber Liquidators' unfair and deceptive trade practices, Plaintiffs and Class Members were deceived into purchasing the Laminates and have been damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other individuals similarly situated, requests the following relief:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the respective Classes;

B.    Injunctive relief requiring Defendant to inform Plaintiffs and Class members that:

- Lumber Liquidators has not effectively disclaimed the implied warranty of merchantability, and that the Laminates continue to be subject to such

implied warranties;

- the warranty limitations contained in Defendants "limited warranties" are unenforceable;

- Plaintiffs and Class members are entitled to restitution, including reimbursement for any demolition and installation costs; and

- Plaintiffs and Class members may be entitled to other relief as awarded by this Court, including additional relief under the consumer protection and deceptive trade practices acts of the respective jurisdictions for each of the Classes;

C. Restitution of all monies Defendant received from Plaintiffs and the Classes, pursuant to the consumer protection and deceptive trade practices acts of the respective jurisdictions for each of the Classes;

D. Damages to be determined in at trial including actual, compensatory, and consequential damages incurred by Plaintiffs and Class Members;

E. Punitive damages where allowed by the consumer protection and deceptive trade practices acts of the respective jurisdictions for each of the Classes;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

F.   An award of reasonable attorneys' fees and costs; and

G.   That the Court award such other and further relief as this Court may deem

appropriate.

Executed this 27th day of February, 2017.

Respectfully Submitted,

*/ s / Alexander Robertson, IV*

*/ s / Daniel K. Bryson*

Alexander Robertson, IV
**ROBERTSON & ASSOCIATES, LLP**
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Telephone:     818-851-3850
arobertson@arobertsonlaw.com

Daniel K. Bryson
**WHITFIELD BRYSON AND MASON, LLP**
900 West Morgan Street
Raleigh, North Carolina 27603
Telephone:     919-600-5000
dan@wbmllp.com

*/ s / David Hilton Wise*

*/ s / Robert Ahdoot*

David Hilton Wise, VA Bar #30828
**WISE & DONAHUE, PLC**
10476 Armstrong Street
Fairfax, VA 22030
Telephone: 703-934-6377
dwise@wisedonahue.com

Robert Ahdoot
AHDOOT & WOLFSON, PC
1016 Palm Avenue
West Hollywood CA 90069
Telephone: 310-474-9111
rahdoot@ahdootwolfson.com

*Co-Counsel for Plaintiffs Abad, Atkins, Bennett, Bolin, Coburn, Coleman, Cottington, Chestnut, Dumais, Dunkin, Florez, Frazier, Garrity, Goodling, Haygood, Hotaling, Jackson, Kunicki, Leonard, Lyznick, Manzo, Markoski, Masters, McPherson, Myers, Moylen, Norris, Page, Perel, Ryan, Saldivar, Sesti, Sirois, Solorio, Strong, Webster, Weiss, Wieland, and Williams*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 27th day of  February, 2017, I will

electronically file the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ David Hilton Wise*
David Hilton Wise